<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| HIGHLAND CAPITAL CORPORATION,<br><br>    Plaintiff,<br><br>    v.<br><br>MATTHEW E. PASTO, et al.,<br><br>    Defendants. | Civil Action No. 19-14282 (EP) (ESK)<br><br>**OPINION** |

**<u>Padin</u>**, **District Judge:**

Plaintiff Highland Capital Corp. ("Highland") alleges that Defendants Matthew E. Pasto, M.D. (a business/the "Borrower") and Matthew E. Pasto (an individual/the "Guarantor", collectively "Pasto") defaulted on a financing contract by failing to pay for medical equipment and subleasing that equipment to Pasto's business associate James Drury. Pasto filed counterclaims against Highland and a third-party complaint against, among others, Drury and Drury's companies National Medical Partners, Inc. ("National") and Life Saving Images, Inc ("Images"), alleging a scheme to defraud Pasto.[1] Highland moves for summary judgment on the Complaint and to dismiss Pasto's counterclaims, which the Court will grant for the reasons below.

---

[1] Pasto also sued the Sacramento Valley Affiliate of the Susan Komen Breast Cancer Foundation ("Valley") and Martha Drury. Valley, National, and Images were all dismissed for failure to prosecute. D.E.s 48, 49, 77, 78. On April 7, 2021, the Court (Martinotti, J.) issued a call for dismissal as to James and Martha Drury and later dismissed the Third-Party Complaint only against James Drury. D.E. 67. Thus, after this decision, the only remaining claim is Pasto's third-party action against Ms. Drury—a Clerk's default was entered September 2, 2021 but Pasto has taken no further action. Accordingly, in a separate order, the Court will order Pasto to move for judgment within 14 days and/or show cause why the claim should not be dismissed. The Court notes that Martha Drury's role is unclear from Pasto's pleadings.

**I.      BACKGROUND**[2]

   **1.      Highland and National/Drury**[3]

Highland is a "vendor-based lender." Highland Facts ¶ 46. Vendors bring customers to Highland, which screens both the vendor and the customer to see if they meet Highland's lending criteria. Highland Facts ¶ 46, citing Juliano Dep.[4] (D.E. 91-4 at 60) at 32:11-33:16. Before these events, the only prior interaction between Highland and National, Drury's company, was a single transaction, two months prior, for a different customer also introduced by National.[5] *Id.* ¶ 48. As Highland did with all vendors, Highland vetted National to see if National met Highland's underwriting standards. *Id.* at ¶¶ 46-47, citing Juliano Dep. 56:9-19.

The only business between Highland and National/Drury was the subject transactions below. Juliano Decl. 93, ¶ 76. Highland ceased business with National/Drury after Pasto's default, discussed below. Highland Facts ¶ 56.

   **2.      Pasto and Drury**

Dr. Pasto met Drury in 2015. D.E. 95-3 ("Pasto Supp. Facts") ¶ 1. At the time, Drury supplied mobile mammography screening to several companies in Santa Clara County and wanted to add breast ultrasounds as an additional service. *Id.* Pasto agreed and trained to conduct those ultrasounds. *Id.*

---

[2] These facts are drawn from Highland's facts (D.E. 91-3 ("Highland Facts")), Pasto's response (D.E. 95-2 ("Pasto Facts")), Pasto's supplemental facts (D.E. 95-3 ("Pasto Supp. Facts")), and Highland's exhibits (D.E. 91-4, 5). Any specific disputes are addressed.
[3] Pasto denies every fact related to this issue without evidence or explanation, asserting either insufficient knowledge or blanket denials. Pasto Facts ¶¶ 46-59. Accordingly, the Court considers the allegations unopposed. *See* Fed. R. Civ. P. 56(e)(2); Advisory Committee Notes to 1963 amendment (noting that "the very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").
[4] Highland Assistant Vice President Ross Juliano. D.E. 91-5.
[5] Highland points out that Pasto, not Highland, met Drury first, as evidenced by Pasto's 1099 forms showing 2015 payments from National. Highland Facts ¶ 58, citing Juliano Decl. at 107.

In 2015 and early 2016, Drury registered Images with the California Secretary of State in his name, with the aim of performing cancer screenings for corporate customers. *Id.* ¶ 2. In early 2016, Drury sought to purchase mammography equipment for Images and asked Pasto to act as the interpreting physician on a pay-for-case basis. *Id.* ¶ 3. Drury, who "had personal credit issues," also asked Pasto to rent an office in Pasto's name in Sunnyvale, California (the "Sunnyvale Office"). *Id.* ¶ 4.

In May 2016, Drury and Pasto executed two agreements for Pasto to be Drury's medical advisor for a stipend. *Id.* at ¶ 5. Drury, reiterating his "shaky" credit history and explaining that only a medical doctor could purchase medical equipment, asked Pasto to sign the purchase documents. *Id.* According to Pasto, Drury "arranged all equipment acquisitions, purchases, and financing agreements." *Id.* ¶¶ 6-7.

### 3. Agreement 1 between Highland and Pasto, the Ultrasound Equipment

On May 14, 2016, Pasto executed Equipment Lease Agreement Number 20161137 with Highland. Highland Facts ¶¶ 1-3, citing Juliano Decl. at 21 ("Agreement 1"); D.E. 95-2, Pasto Facts ¶¶ 1-3. Agreement 1 governed the financing for the purchase of an Alpinion E-Cube Ultrasound ("Equipment 1") from a third-party vendor, Complete Medical Services. *Id.* Pasto also executed an unconditional guaranty. Highland Facts ¶¶ 4-5, citing Juliano Decl. at 22; Pasto Facts ¶¶ 4-5. Highland also filed a UCC-1 financing statement.[6] Highland Facts ¶ 7, citing Juliano Decl. at 34.

Pasto provided Highland with account information and authorization to directly debit payments from Pasto's personal Wells Fargo checking account, opened and maintained only in

---

[6] Pasto denies this despite lacking "the requisite knowledge to admit or deny." Pasto Facts ¶ 7. He does not, however, challenge the financing statement's authenticity or substance.

3

Pasto's name.  Highland Facts ¶ 6, citing Juliano Decl. at 26-30; Pasto Facts ¶ 6.  Agreement 1 required 3 months of payments at $99, followed by 81 at $773.54, plus tax.

Pasto also executed an Authorization for Advanced Funding.  Highland Facts ¶ 8, citing Juliano Decl. at 36; Pasto Facts ¶ 8.  The Authorization provides:

> [Pasto] hereby agrees and authorizes [Highland] to make an Advance Payment… COMPLETE MEDICAL SERVICES prior to the delivery of the Equipment. **The Advance Payment is hereby specifically authorized, acknowledged and approved by [Pasto]**.

Juliano Decl. at 36, ¶ 2 (emphasis in original).

The Authorization for Advance Funding further provides:

> [Pasto] and [Highland] agree that as of the date of the Advance Payment, [Pasto] shall be irrevocably deemed to have accepted the Equipment for all purposes under the Lease and that the effective date of the Lease shall be deemed to be the date [Highland] remits the Advance Payment to the Vendor. Thereon, the Lease will be deemed to be in full force and effect, and **[Pasto] may not cancel the Lease for any reason whatsoever**. [Pasto] shall remain fully responsible under all the terms and conditions of said Lease, irrespective of any other parties' performance, action or lack thereof, including but not limited to the functionality of the Equipment, computer software, equipment service or training or the ability of the Vendor to make available the Equipment at any specific time.

Juliano Decl. at 36, ¶ 4 (bold in original).[7]

On May 18, 2016, Pasto verbally verified that Highland was authorized to distribute the Equipment 1 payment to the vendor.  Highland Facts ¶ 11, citing Juliano Decl. at 38.  That day, Highland paid the vendor.  Highland Facts ¶ 11, citing Juliano Decl. at 42.  Pasto also

---

[7] The underlined portion from the actual Authorization differs from Highland's recitation in two ways. *Compare* Juliano Decl. at ¶ 4 with Highland Facts at 4, ¶ 10.  First, the actual Authorization refers to the Agreement as a "Lease."  Second, Highland's version ends with "or any party in conjunction with the Agreement."  This change adds a material term: that Pasto remains responsible no matter the actions of a third party.  Notwithstanding these changes, Pasto remains liable under the actual terms of the Agreements for the reasons below.

4

acknowledged, in writing and verbally, that he accepted and used Equipment 1 in working order. Highland Facts ¶¶ 12-14, citing Juliano Decl. at 47; Pasto Supp. Facts ¶ 7.[8]  Pasto paid Highland from his personal Wells Fargo checking account until November 20, 2018.  Highland Facts ¶ 15, citing Juliano Decl. at 51-74 (the "Wells Fargo Statements").[9]

Agreement 1 provides that "If [Pasto]…fails to pay any amount…when due…[he] shall be in default."  Pasto Facts ¶ 16, *admitting* Highland Facts ¶ 16.  Pasto failed to make the required monthly payments beginning December 20, 2018.  Pasto Facts ¶ 17, *admitting* Highland Facts ¶ 17; Highland Facts ¶ 19.[10]

### 4. Agreement 2 – the Mammography Equipment

The Agreement 2 facts (and disputes[11]) are largely the same as Agreement 1, save for the type of equipment, vendor, National (Drury's company), and payment (3 months at $99 and 81 at

---

[8] Pasto disputes that he admitted to acceptance, possession, and use of Equipment 1.  Pasto Facts at ¶¶ 13-14.  But Pasto admits to signing an Acknowledgment and Acceptance of Delivery.  Pasto Facts ¶ 12, *admitting* Highland Facts ¶ 12.  Pasto also previously admitted the same when opposing an earlier summary judgment motion.  *See* D.E. 45-2 at 5, ¶ 16 ("I did no negotiating…with Highland…other than confirmation of my identity by phone when signing the contracts, *and one follow-up phone call per contract to verify delivery of the equipment.*") (emphasis added).

[9] Pasto disputes this, too, arguing that the bank records show payments "made by Third-Party Defendant and vendor Michael Drury and Defendants as there was an agreement to share payments."  Pasto Facts ¶ 15.  The accounts do, indeed, show money coming in from a "Drury James" account.  *See, e.g.,* Juliano Cert. at 66.  But whatever the nature of the agreement between Drury and Pasto, money transferred from Pasto's account to Highland.  *Id.*

[10] Pasto denies that he "continues to refuse to make payment of the outstanding amount," explaining that he has "attempted to settle the matter in good faith, but [Highland] has refused to cooperate…to retrieve the stolen equipment."  This is not a denial, but in any event Pasto has acknowledged the default.  Pagano Decl. at 26, ¶ 1. ("…which caused the default that Highland is now acting upon.").

[11] See Pasto Facts ¶¶ 25-26, 32-34, 37-38; fns. 5-6.

$1,157.82). On May 27, 2016, Pasto signed Agreement 2 (with Agreement 1, "Agreements"), which financed the purchase of a refurbished Hologic Selenia and two monitors ("Equipment 2," with Equipment 1 the "Equipment"). Pasto also signed a personal guaranty ("Guaranty 2," with Guaranty 1, the "Guarantees"). Highland Facts ¶ 23. Highland again filed a UCC-1 financing statement. Highland Facts ¶ 26.

Pasto acknowledged acceptance, possession, and use of Equipment 2. Highland Facts ¶¶ 31-33, citing D.E. 45-2 ¶ 16, Pagano Decl. at 139, ¶ 3[12], *and* Juliano Cert. at 85, ¶ 3 and 91. Like Agreement 1, payments to Highland came from Pasto's account. Highland Facts ¶ 34, citing the Wells Fargo Statements. Payments continued until October 22, 2018, and Pasto defaulted in November 2018, after paying for over two years. Highland Facts ¶¶ 34-38.

5. **The Agreements prohibited the Equipment's assignment**

The Agreements each contained an identical clause requiring the Equipment to be kept at Pasto's address or obtain Highland's written consent to move it. Agreement 1 and 2 ¶ 9. The Agreements (¶ 12) also prohibited the Equipment's transfer:

> ASSIGNMENT: YOU HAVE NO RIGHT TO SELL, TRANSFER AND ASSIGN OR SUBLEASE THIS LEASE OR THE EQUIPMENT.

6. **Pasto and Drury enter separate agreements**

As Pasto entered the Agreements with Highland, Pasto and Drury simultaneously signed an "Ultrasound Agreement" referencing Agreement 1 and "Mammography System Agreement" referencing Agreement 2 (together the "Pasto-Drury Agreements"). Highland Facts ¶ 41, citing Pagano Decl. at 57-58. The parties dispute whether the Pasto-Drury Agreements constituted subleases, but their gist is this: Images, Drury's business, would use the Equipment and pay the

---

[12] References the Declaration of Elisa M. Pagano, Highland's counsel.

exact amount due from Pasto to Highland under the Agreements, plus a consulting fee: $1,000 for the Ultrasound Agreement and $500 for the Mammography Agreement. Highland Facts ¶ 42. The Pasto-Drury Agreements also granted Images various options to purchase the Equipment. Highland Facts ¶¶ 43-45.

### 7. Pasto defaults

According to Pasto, Drury "assured [Pasto] that [Drury] would handle all contracts and insurance[.]" Pasto Supp. Facts ¶ 11. Had Pasto realized at the time that the Agreements gave Drury a potential ownership interest in the Equipment, he would not have signed them. *Id.* ¶ 13.

After Pasto signed the Agreements, Drury opened Pasto's Wells Fargo account as a "pass through for payment of rent, reimbursement for equipment lease payments, and payment for Pasto's services as a diagnostic radiologist." *Id.* ¶ 14. The relationship between Pasto and Drury continued without issue through 2016 and early 2017—money came into the account from Drury, and left to pay Highland. *Id.* ¶¶ 15-16.

In early 2017, Drury expanded too quickly. In addition to other equipment purchases, Drury—without Pasto's consent—partnered with Harbor-UCLA.[13] *Id.* ¶ 18. As Drury's payments became more erratic in fall 2017, Pasto informed Drury that he intended to terminate the Sunnyvale Office lease, and did so in December 2017. *Id.* ¶ 19. Around that time, Pasto also stopped providing his radiology services to Images. *Id.* ¶ 22.

Though payments from Drury slowed, Pasto continued paying Highland for the Equipment into early 2018—by the end, from personal family funds. *Id.* ¶ 20. This continued until November 2018, when Pasto notified Highland that he could no longer afford payments. *Id.* ¶ 21. According

---

[13] Pasto does not explain what Harbor-UCLA is, but it appears to be a medical center. *See* https://dhs.lacounty.gov/harbor-ucla-medical-center/.

to Pasto, the Equipment "was removed in the dead of night without Pasto's knowledge[.]" *Id.* ¶ 22.

### 8. Highland files suit

Highland sued Pasto in New Jersey Superior Court, Passaic County. D.E. 1 at 4 (the "Complaint"). Pasto removed to this Court on diversity jurisdiction grounds.[14] D.E. 1 at 1.

The Complaint alleges several claims: (1) breach of contract (Agreement 1); (2) breach of contract (Agreement 2); (3) estoppel; (4) unjust enrichment; and (5) conversion. The Complaint seeks $106,919.03, plus fees and costs. *Id.* at 9. Pasto's Counterclaim alleges that Highland conspired with the Third-Party Defendants to defraud Pasto. D.E. 2. Pasto's Third-Party Complaint alleges breach of contract, fraud and breach of fiduciary duty, and conversion against all Third-Party Defendants. D.E. 3.

Highland previously moved for summary judgment before discovery, which the Court (Martinotti, J.) denied based on issues of fact as to the delivery of the Equipment and payments by Pasto. D.E.s 48, 49. Judge Martinotti also denied a motion to reconsider. D.E. 71. According to Highland, discovery has now resolved any outstanding issues of fact.

## II. LEGAL STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[14] Highland is incorporated in Delaware and has a principal place of business in New Jersey, and Pasto is a California resident.

Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In other words, a court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

## III. DISCUSSION

Highland argues that this is a "simple commercial collection matter" without any genuine issues of material fact, including on Pasto's counterclaims. According to Highland, Dr. Pasto's business defaulted, and he personally and unconditionally guaranteed the debt. Highland contends that Pasto's counterclaims and defenses, which essentially state that Highland conspired with Drury to defraud Pasto, have no support in the record. The Court agrees: whatever the relationship between Highland and Drury—and to be clear, the record reveals none of any significance—Pasto's business (the Borrower) promised to pay and did not. Because Pasto the individual (the Guarantor) guaranteed the Agreements, the business and the individual are jointly liable.

### 1. Breach of contract generally

"The interpretation of private contracts is ordinarily a question of state law." *Martin v. DHL Express (USA), Inc.*, 580 F. Supp. 3d 66, 72 (D.N.J. 2022) (citing *Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 474. Under New Jersey law, which governs this action, a contract is formed through "offer, acceptance, consideration, and performance by both parties." *Shelton v. Restaurant.com, Inc.*, 214 N.J. 419 (2013). There are four elements to a claim of breach of contract: a contract, the plaintiff's performance, the defendant's failure to perform, and damages. *Woytas v. Greenwood Tree Experts, Inc.*, 237 N.J. 501 (2019) (citing *Globe Motor Co. v. Igdalev*, 225 N.J. 469 (2016)).

As discussed above, the material allegations are straightforward and substantively undisputed. The contract: Highland financed the Equipment which Pasto's business (as Borrower) selected from third-party vendors, and Pasto the individual (as Guarantor) guaranteed. *Above* at §§ (I)(3-4). Highland's performance: Pasto confirmed delivery of the Equipment, and authorized Highland to pay the third-party vendors, which it did. *Id.* Pasto's default: Pasto stopped making

10

payments. *Id.* at § (I)(7). And the damages: Highland sued for the payments owed under the Agreements, plus contractual fees.

Courts in this district and beyond have routinely granted summary judgment based on similar agreements. *Highland Cap. Corp. v. W. Foot & Ankle Ctr., Inc.*, No. CIV.A. 07-4029, 2009 WL 315727, at *3 (D.N.J. Feb. 6, 2009) (granting summary judgment where there was no dispute that defendant financed MRI equipment from a third-party vendor through Highland and defaulted after a year of making payments); *Ascentium Capital LLC v. Bayshore Medical Associates, Inc.*, No. SOM-L-1327-16, 2017 WL 5195938, at *4 (N.J. Super. Law. Div. June 23, 2017) (granting summary judgment against both borrower and guarantor where it was undisputed that plaintiff financed the purchase of equipment by defendant from third-party seller and borrower defaulted).

### 2. The "hell-or-high-water" clause

Pasto's counterclaim, and the thrust of the opposition here, argues that Pasto is not liable because the Agreements are fraudulent and/or otherwise unenforceable. Opp'n 7-11; D.E. 2 ("Answer") pp. 3-5. Specifically, Pasto alleges that the following material facts remain disputed: (1) the nature of the relationship between Drury and Highland, *i.e.* whether Drury was Highland's agent; (2) whether, if Drury was an intermediary and Highland's agent, there was a meeting of the minds between Highland and Pasto that created a contract; (3) whether there was a meeting of the minds as to the nature of the Agreements; and (4) whether Highland was a holder in due course/payee subject to personal defenses that Pasto can raise based on his interactions with Drury. These arguments are either immaterial or unsupported, or both.

But as Highland argues, Pasto's agency and fraud defenses, both as Borrower and Guarantor, are barred by the Agreements' hell-or-high-water clause providing that payments are "ABSOLUTE AND UNCONDITIONAL WITHOUT ANY ABATEMENT, SET-OFF,

DEFENSE OR CLAIM FOR ANY REASON." Agreements ¶ 2. Courts around the country regularly enforce such clauses. *Wells Fargo Bank Minnesota v. BrooksAmerica Mortg. Corp.*, No. 02 CIV. 4467, 2004 WL 2072358, at \*7 (S.D.N.Y. Sept. 14, 2004), *aff'd sub nom. Wells Fargo Bank, N.A. v. BrooksAmerica Mortg. Corp.*, 419 F.3d 107 (2d Cir. 2005); *Lyon Financial Services, Inc. v. Woodlake Imaging, LLC,* 2005 WL 331695, \*4 (E.D. Pa. 2005); *Colorado Interstate Corp. v. The CIT Group/Equipment Financing, Inc.,* 993 F.2d 743 (10th Cir.1993); *Siemens Credit Corp. v. Amer. Transit Ins. Co.,* 2001 U.S. Dist. LEXIS 264 (S.D.N.Y.2001); *The Philadelphia Savings Fund Soc. v. Deseret Management Corp.,* 632 F. Supp. 129 (E.D.Pa. 1985). This is true even "in the face of various kinds of defaults by the party seeking to enforce them." *Wells Fargo Bank, N.A. v. BrooksAmerica Mortgage Corp.,* 419 F.3d 107, 110 (2d. Cir. 2005) (*quoting In re O.P.M. Leasing Servs., Inc .,* 21 B.R. 993, 1006–07 (Bankr. S.D.N.Y.1982).

Indeed, the Appellate Division recently held such a clause enforceable in another case brought by Highland. *Highland Cap. Corp. v. Sassan Kafayi, DDS*, No. A-1978-18T1, 2020 WL 914710, at \*3–4 (N.J. Super. Ct. App. Div. Feb. 26, 2020) (holding that doctor's breach of warranty argument was "not a defense to Highland's claims under the finance agreement [because the] obligation to make the payments required under the clear, express terms of the finance agreement is unconditional."); *see also Ascentium Capital*, 2017 WL 5195938, at \*4 (enforcing hell-or-high-water clause to bar defenses).

Likewise, Pasto, as Guarantor, enjoys no defenses pursuant to the unconditional guaranty. *Brae Asset Fund, L.P. v. Newman*, 327 N.J. Super. 129, 136–37 (App. Div. 1999) ("…the guaranties, even as strictly construed and interpreted most adversely against the [b]ank, preclude defendant's asserted defenses to their enforcement"). Accordingly, whatever Pasto's fraud or agency arguments, they are barred.

### 3. Pasto's counterclaim/defenses

Even if the Court considered those arguments, however, the record after discovery lacks any support for them. Pasto's first argument is that the deposition of Highland Vice President (and Highland's affiant here) Ross Juliano demonstrates that a question of fact remains about Drury's purported role as Highland's agent. Opp'n 8-10. But what Pasto offers is Juliano's extensive deposition testimony comparing Highland's role to that of a bank in a car sale; that is, a neutral, arms-length party to whom the vendor (the dealership) brings a customer (the car buyer). *Id.* at 8. It is unclear how Juliano's comparison to another arms-length commercial transaction bears on any alleged nefarious agency relationship between Highland and Drury.

Likewise, Pasto attempts to manufacture another factual dispute by arguing that Highland departed from its usual procedure of disbursing payment after confirming equipment delivery verbally and in writing. *Id.* at 8. But the cited testimony does no such thing; rather, Juliano testified that funds were disbursed "*either* through written delivery…*and/or* verbal audit." Juliano Dep. 39:6-12. And even if Pasto's characterization of the testimony were accurate, the significance of any departure from normal practice is unclear. If anything, Pasto's argument simply highlights his admissions that he acknowledged delivery of the Equipment that Highland paid for. Opp'n 11 ("These [forms] were executed…after the equipment was delivered…the funding was paid.")

Pasto next argues that there was no meeting of the minds between Pasto and Highland because Drury was the conduit between them. *Id.* at 12-19. According to Pasto, the Agreements which he believed Drury was providing for him to sign were "completely different than what [Highland] has asserted are the terms of the Agreements." *Id.* at 17. Pasto also argues that the "type of instrument/agreement the Agreements were intended as or can actually be construed as based on their text," including any ownership stake in the Equipment, is unclear. *Id.* at 18.

But if a contract is unambiguous, the parol evidence rule bars the Court from considering any extrinsic evidence of the parties' subjective intentions. *See Filmlife, Inc. v. Mal "2" Ena, Inc.*, 251 N.J. Super. 570 (App. Div. 1991) (rejecting auto lessee's argument that written lease terms were different than what was promised orally). Pasto argues, in substance, that the Agreements are ambiguous because they "can lead a reasonable party to question whether a security interest or ownership interest in the equipment is what was intended," and that the Agreements might violate various provisions of the Uniform Commercial Code (UCC). Opp'n 19-32. As Highland argues in reply, however, even documents referred to as a "lease" is nevertheless a financing agreement based on its economic reality, *i.e.* leased property serving as a collateral for a loan with a purchase option. N.J.S.A. 12A:1-203(a)(4); *C&J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65 (Iowa 2011). Indeed, Pasto recognizes as much. Opp'n 23 ("…New Jersey court[s] have routinely viewed these agreements [with] Highland as security interests vs. finance leases.") (citing *Kafayi*, 2020 WL 914710). Thus, the Agreements are unambiguous about the parties' respective responsibilities.

That Pasto did not adequately review the Agreements he admits to voluntarily signing cannot be considered. This is because "affixing a signature to a contract creates a conclusive presumption that the signer read, understood, and assented to its terms." *Greenfield v. Twin Vision Graphics, Inc.*, 268 F. Supp. 2d 358, 373–74 (D.N.J. 2003) (citing *Fivey v. Pennsylvania R.R. Co.,* 67 N.J.L. 627, 632, 52 A. 472, 473 (N.J. Err. & App. 1902)) ("[t]he fact that the plaintiff did not choose to read the paper, or the material parts of it, before signing, or did not know its contents at the time, cannot, in the absence of actual fraud, relieve him from its obligations."). This is particularly true for Dr. Pasto, an educated individual, but it would also be true for individuals in a less advantageous position to understand commercial contracts. *Swift v. N. Am. Co. for Life &*

*Health Ins.*, 677 F. Supp. 1145, 1150 (S.D. Fla. 1987) ("The rule…[applies] even to contracts of illiterate persons on the ground that if such persons are unable to read, they are negligent if they fail to have the contract read to them."); *Vivas v. Safra Nat'l Bank of New York*, No. 1:10-CV-21811, 2010 WL 11602462, at *6 (S.D. Fla. Nov. 8, 2010) (collecting cases).

Accordingly, even accepting that Drury was a go-between, Pasto's signature evidenced an intention to create an enforceable contract, and an acknowledgment that he read and understood what he was signing.

Moreover, as Highland argues, the record demonstrates that Pasto's conduct ratified the Agreements. Reply 33. Ratification is "the affirmance by a person of a prior act which did not bind him but which was done, or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *In re Dwek*, No. 07-11757, 2010 WL 2196417, at *4 (Bankr. D.N.J. June 1, 2010), *aff'd*, No. ADV 07-1616 KCF, 2011 WL 843635 (D.N.J. Mar. 8, 2011); *see also Merchants Indem. Corp. v. Eggleston*, 37 N.J. 114, 130–31 (1962) (holding that when a contract is obtained by fraud, the law grants the injured party may rescind or affirm, but not both). Even where actual fraud has occurred, regular payments can ratify a contract if the defrauded party had full knowledge of all material facts. *Dwek*, No. 07-11757, 2010 WL 2196417, at *1, 6 (regular payments over an 11-month span ratified the contract); *see also Edison Generator Exch., Inc. v. Quality Bus. Commc'ns, Inc.*, No. A-0715-09T1, 2010 WL 2696637, at *3 (N.J. Super. Ct. App. Div. July 1, 2010) (explaining that that in a non-consumer finance lease, the lessee's obligations under the contract become "irrevocable and independent upon the lessee's acceptance of the goods").

Here, Pasto does not dispute that payments were regularly made from a bank account solely in his name, pursuant to an agreement which he admits signing, to pay for equipment which Pasto

15

acknowledged receiving. What Pasto *does* argue is that he essentially acted as a pass-through for Drury's payments to Highland for the Equipment—Drury deposited money from using the Equipment, money automatically transferred to Highland. Pasto Facts ¶¶ 15, 34.

But this merely highlights that Pasto paid Highland with money obtained from violating the Agreements by subleasing to Drury. Any insinuation that the payments did not ratify the Agreements is further belied by Pasto's admission that he "continued payments for the equipment (over $4,000 per month) even though [he] was receiving only meager payments from [Drury]." Pasto Supp. Facts ¶ 20. In other words, even if his bank account was at some point a passive conduit for Drury's activity—an assertion the record contradicts—Pasto actively paid Highland when Drury's deposits stopped.

The remainder of Pasto's analysis is difficult to comprehend, but appears to rehash his agency arguments. That is, Pasto attempts to argue that because Highland retained a security interest, and because Drury acted as a go-between, there is a question of fact as to whether Drury exercised apparent authority as Highland's agent. Opp'n at 23-31. But as before, Pasto cites almost nothing from the record to support this conclusion. And what he does cite—Juliano's comparison to a car sale (Opp'n 31)—still fails to demonstrate any dispute having any bearing on the central issue: whether Pasto had a contract with Highland and breached it. Pasto simply has not identified any evidence in the record, or precedential support, suggesting that Drury was acting on Highland's behalf. Accordingly, summary judgment for Highland is appropriate.

4.     **Fees and costs**

Finally, having found that summary judgment on the Complaint and dismissing the Counterclaims is warranted, the Court must address Highland's fee application seeking $88,029.00 in fees and $1,656.01. D.E. 91-6. In the absence of any opposition, and having reviewed the

16

application and being satisfied that the fees are reasonable, the Court will also grant the fee application in its entirety.

As an initial matter, Agreements 1 and 2 each contain provisions requiring payments to Highland for "expenses incurred in connection with the enforcement of [Highland's] remedies including collection costs, reasonable attorney's fees, and court costs." ¶ 11. The only question is the appropriate amount.

"To determine a fair and reasonable award of attorneys' fees, the Court considers factors including the time and labor involved, skill required, customary charges for similar services, benefits obtained from the service and the certainty of compensation." *Staples v. Ruyter Bay Land Partners, LLC*, No. CIV. 2005-11, 2008 WL 413308, at *1 (D.V.I. Feb. 6, 2008) (citing cases). In examining reasonableness, courts must determine whether the hours billed were "reasonably expended," excluding time billed that is "excessive, redundant, or otherwise unnecessary." *Berne Corp. v. Gov't of Virgin Islands,* 2012 WL 369535 at *10 (D.V.I. Feb. 3, 2012) (quoting *Pub. Interest Research Group of N.J., Inc. v. Windall,* 51 F.3d 1179, 1188 (3d Cir. 1995)).

For example, the Court considers whether the issues in a case are novel and complex, or relatively commonplace. *See Firstbank P.R. v. Connor,* 2009 WL 2515729, at *2 (D.V.I. Aug. 11, 2009); *see also Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 168 (3d Cir. 1973). When a matter "involve[s] run-of-the-mill debt and foreclosure claims, and [is] disposed of at the summary judgment stage," the Court, in its discretion, may reduce the award of attorney's fees accordingly. *Firstbank P.R. v. Caribbean Island Adventure, Inc.,* 2008 WL 783537 at *2 (D.V.I. Mar. 20, 2008). Courts may refuse to reimburse a party for particular billing entries that reflect work "that was billed excessively or repeatedly." *Id.* (citing *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 414, 422 (3d Cir. 1993)).

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  This amount is also referred to as the "lodestar" and creates "a presumptively reasonable fee." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 183 (2d Cir. 2008).  A reasonable hourly rate is the "prevailing market rate," or the rate "prevailing in the [relevant] community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).  The number of reasonable hours is calculated by taking the hours actually expended less any "excessive, redundant, or otherwise unnecessary" time. *Hensley*, 461 U.S. at 433.  "Hours that are 'excessive, redundant, or otherwise unnecessary,' are to be excluded, and in dealing with such surplusage, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed 'as a practical means of trimming fat from a fee application.'" *Dagostino v. Computer Credit, Inc.*, 238 F. Supp. 3d 404, 413 (E.D.N.Y. 2017) (quoting *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998)); *see also Premium Freight Mgmt., LLC v. PM Engineered Sols., Inc.*, 906 F.3d 403, 410 (6th Cir. 2018) (affirming general reduction of twenty percent instead of "pars[ing] the billing records for unrecoverable fees" because "[i]t is not the role of the district court to serve as [a] green-eyeshade accountant.").

The Court will reduce the fees by a third for several reasons.  First, it appears that the vast majority of fee entries, including administrative entries, were by attorneys at the $320 hourly rate rather than paralegals at the $230 hourly rate. *L.T. v. Mansfield Twp. Sch. Dist.*, No. CIV.A. 04-1381, 2009 WL 1971329, at *5 (D.N.J. July 1, 2009) (applying blended rate of $250 per hour).  Second, Highland expended significant time on both an unsuccessful summary judgment motion

and a motion to reconsider, both of which should have significantly reduced the amount of time spent on this latest, successful motion.  And finally, there are numerous, vague entries listing only "attention to" a docket notice or some other document.  *See, e.g.,* D.E. 91-6 at 63 (3.8 and 2.5 for "attention to preparing motion for reconsideration"), 67 (.4 for "attention to issues re: reply), 81 (.4 for "attention to discovery").  And finally, Highland itself characterized this action as a simple commercial collection matter.  Accordingly, the Court will reduce the fees sought, $88,029.00, by one third, resulting in a fee award of $61,620.30, plus costs ($1,656.01).

## IV.  CONCLUSION

For the reasons above, Highland's motion for summary judgment will be GRANTED.  The fee application will also be GRANTED.  Because a third-party defendant, Martha Drury, remains in the case, the Court will ORDER Pasto to move for default judgment pursuant to Fed. R. Civ. P. 55(b)(2) and/or SHOW CAUSE why the claims against Martha Drury should not be dismissed.  Appropriate orders follow.

Dated**:  October 11, 2022**

_____
Evelyn Padin, U.S.D.J.